WAYMOND M. BROWN, Judge
Appellant appeals from the circuit court's order terminating her parental rights to K.R., born 08/26/2003; and G.L., born 05/09/2010.[1] On appeal, appellant argues that (1) the circuit court committed reversible error in terminating her parental *512 rights on a ground that was not pled in appellee Arkansas Department of Human Services' (DHS) termination petition, and (2) the evidence was insufficient to support the circuit court's aggravated-circumstances finding. We affirm.
The family became involved with DHS through a family-in-need-of-services (FINS) case opened on March 17, 2016, due to the poor school attendance of both K.R. and G.L. as well as that of their eldest sibling.[2] DHS filed a petition for emergency less-than-custody protections order on October 27, 2016, requesting the following protections for the juveniles:
ordering Patricia Lopez to ensure the juveniles are attending school, ensure that [G.L.] attends any testing by the school for an [Individualized Education Plan] IEP, attend the medical/developmental appointments for [G.L.], cooperate with [Intensive Family Services] IFS services [sic] and recommendations by the provider, and complete a psychological evaluation along with the recommendations.
In the affidavit in support of the petition, the family services worker (FSW) stated that DHS "requests court involvement to ensure that [appellant] follows through with services set up by [DHS] and ensure that [appellant] gets the kids to school in a timely manner, especially given the delays and needed services for [G.L.]" The circuit court entered an ex parte order for emergency less-than-custody protections on October 27, 2016.
A probable-cause order was entered on November 5, 2016, finding-and accepting the parties' stipulation to the same-that probable cause existed at the time the circuit court signed the emergency order and still existed. The order stated:
Custody shall continue with [appellant]. The Less-Than-Custody protections shall remain in place. Specifically, [appellant] shall ensure both juveniles are attending school, [G.L.] attends any testing, [G.L.] attends any medical/developmental appointments, cooperate with IFS services, and submit to a psychological evaluation. The juveniles shall attend school unless there is a doctor's excuse.
DHS filed a petition for emergency custody and dependency-neglect on December 14, 2016. The affidavit in support thereof stated the following, where pertinent and not duplicative:
[DHS] filed a petition to get the case before the judge. During the course of that involvement, [appellant] was informed on numerous occasions the importance of getting the kids to school and she still failed to do so. [DHS] became aware that [appellant] and the family had been evicted from where they were staying at the Motel 6 due to [appellant's] not working there anymore. [DHS] got it approved for the family to stay at the Rescue Mission and [appellant] chose to stay in a hotel with her boyfriend, Richard Kohlhaas DOB: 10/2/73. The school set up new bus transportation from the Mission to get the kids to school and [appellant] did not avail herself to those services and the kids continued to miss/be late for school.
Intensive family services also attempted to work with [appellant] on obtaining an ID from the Mexican Consulate and [appellant] has failed to get the required paperwork for the consulate. It has also *513 been reported to [DHS] that [appellant] has chosen not to stay at the mission due to them not having room for her boyfriend then lying and saying they were married.
....
[G.L.] had a temporary IEP due to not being at school enough to complete the full assessment to a full IEP. [G.L.] has completed the assessment and now has a fully functional IEP in place, however, he cannot get the services provided if he is not in school.
....
During the course of the case [appellant] has been talked to repeatedly about the importance of getting the kids to school in a timely manner. She has repeatedly said that she would. According to the school records that has not happened. There has [sic] also been home visits made and the kids have still not left for school. On a number of occasions, the mother is waiting for a cab even though the school has provided city bus passes and school bus transportation for the juveniles. [DHS] has transported the juveniles to school several times as well.
Before the Court's involvement, the school also made several home visits to the home and talked to [appellant] repeatedly about school attendance.
Accordingly, DHS had taken a seventy-two-hour hold on the juveniles on December 12, 2016, "due to the educational neglect, unstable housing, and lack of cooperation of services provided and recommendations given." The circuit court entered an ex parte order for emergency custody on December 14, 2016.[3]
The circuit court entered a probable cause and adjudication order on March 13, 2017, finding that there was probable cause to remove the juveniles, whom it adjudicated as dependent-neglected as defined in the Arkansas Juvenile Code, due to educational neglect. It further found that appellant was homeless at the time of the removal. The goal of the case was reunification. Once-per-week visits with the juveniles were ordered for appellant if she were located; she did not appear at the hearing.
The circuit court entered a review order on August 7, 2017, following a hearing on May 11, 2017. Noting that the juveniles were together in a foster home, the circuit court found that the case plan was moving toward an appropriate permanency plan for the juveniles, which remained reunification. It found that DHS had complied with the case plan and its orders and had made reasonable efforts to provide family services to achieve the goal of reunification. It further found that appellant "[had] housing though it [had] not been observed, [did] not have income, [had] transportation, [had] not completed parenting classes, [had] not completed a psychological evaluation, and [had] not submitted to drug screens." Both appellant and her boyfriend were ordered to submit to a drug screen that day and to submit to a hair-follicle test.
In its October 30, 2017 review order, the circuit court found that appellant "did have housing which would have allowed the juveniles to return, however, [appellant's] boyfriend, [Kohlhaas,] is not appropriate. Currently the situation is unstable." The *514 order went on to state that "[t]here shall be no contact" between Kohlhaas and the juveniles or between Kohlhaas and appellant. The goal of the case remained reunification, which the circuit court found to be an appropriate plan. It found that DHS had made reasonable efforts.
DHS filed a petition to terminate appellant's parental rights on December 6, 2017. It asserted that the same was in the best interest of K.R. and G.L. Grounds in support of termination of appellant's parental rights were the willful-failure-to-provide-material-support ground,[4] the other-subsequent-factors ground,[5] and the aggravated-circumstances ground.[6]
Following a hearing on December 7, 2017, the circuit court entered a permanency-planning order on January 5, 2018, changing the goal of the case to "adoption following termination of parental rights." It again found that DHS had complied with the case plan and court orders and had made reasonable efforts. It specifically found:
The Court finds that the mother has no housing, income, or transportation. [DHS] is to provide the mother with another HUD assistance letter. The Court notes that this case has been open for fourteen (14) months and although the juveniles have not been in [DHS's] custody since the beginning, there has been a lack of progress in that amount of time.
It kept its previous restraining order against Kohlhaas in place.
Following hearings held on February 15 and 22, 2018, the circuit court entered an order terminating appellant's parental rights to K.R. and G.L. on April 4, 2018. The circuit court terminated appellant's parental rights finding that "the juveniles [had] remained out of the home in excess of twelve (12) months and [appellant had] failed to remedy the cause of removal and that there is little likelihood that continued time and services would result in a successful reunification." In support, it made the following additional findings:
The case has been open for sixteen months, the mother still has no housing, no stable income, and no transportation. The mother has no ID and has not complied with referrals or court orders. The mother has been employed at OK foods for about two (2) weeks. Prior to that she was employed with Double tree [sic] for two to three months. The mother testified that the longest housing she maintained was on Massard because her boyfriend was able to pay for it. That is *515 the same boyfriend she testified against previously because he was abusive. She has not had her own housing since the juveniles were removed from her care. She is currently residing at the Salvation Army Shelter and was previously at Hope Campus, a homeless shelter, and the Women's Crisis Center, none of which have been stable. The mother was provided with two separate referrals for a psychological evaluation and did not participate. Virtually nothing has been completed on her case plan. The Court finds that the mother has no follow through. This is based on the testimony provided. Specifically, the Fort Smith Public Schools went above and beyond to provide curbside pickup for the juveniles with which she did not comply. The IFS provider, Shelby Fox, set up school based counseling, but the mother did not attend the meeting to [sic] that implemented. The protective services worker, Brittany Harp, provided the mother with printed directions and exact timing to get the juveniles to school and the mother still could not complete the task. The mother was provided with specific instructions in order to get her ID including directions to the Mexican Consulate last spring. The caseworker, Angela Solylo, provided the mother with an opportunity to participate in the Salvation Army transition program and the mother declined. The foster mother testified that she obtained a housing option for the mother which did not require an ID [sic] would allow the electricity to remain on until she was able to assume the payment. The mother did not follow through. The mother indicated that she has called all day long with no answer in order to get her ID or other information, however, the mother no longer has the phone she claims holds the proof. The Court finds that the juveniles have been involved with the Court for an extended period of time, having a FINS case prior to the Dependency-Neglect case, but the mother still exhibits the same problems as before.
It found that termination of appellant's parental rights was in the juveniles' best interest, finding that they were adoptable "as they are in a long term stable placement and the foster mother has indicated an intent to adopt" and that there was potential harm from appellant's "continued homelessness" and "absence of change in her situation over the course of this case." This timely appeal followed.
The rights of natural parents are not to be passed over lightly.[7] The termination of parental rights is an extreme remedy and in derogation of the natural rights of parents.[8] As a result, there is a heavy burden placed on the party seeking to terminate the relationship.[9] However, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child.[10]
We review termination-of-parental-rights cases de novo.[11] It is DHS's burden to prove by clear and convincing evidence that it is in a child's best interest to terminate parental rights as well as the existence of at least one statutory ground *516 for termination.[12] Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established.[13] On appeal, the inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous.[14] A finding is clearly erroneous when, although there is evidence to support it, the appellate court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made.[15] We give a high degree of deference to the circuit court, because it is in a far superior position to observe the parties before it and judge the credibility of the witnesses.[16]
Appellant argues first that the circuit court committed reversible error in terminating her parental rights on a ground that was not pled DHS's termination petition. Appellant argues in her brief to this court that "[t]he circuit court entered its termination order and terminated Patricia's rights based upon the aggravated-circumstances ground but it also terminated her rights on a ground that was not pled in the petition-the failure-to-remedy ground." Accordingly, appellant admits that one of the grounds upon which her parental rights were terminated was alleged in the petition. Only one ground must be proved to support termination.[17] Appellant's second argument is that there was insufficient evidence to support the circuit court's aggravated-circumstances finding. Because this court holds that sufficient evidence supported the circuit court's aggravated-circumstances finding-addressed below-this court declines to address appellant's first argument as moot.[18]
In making her sufficiency argument, appellant states that "here it was only speculative that services would not result in reunification because DHS never offered Patricia the appropriate and necessary services once the children entered foster care." However, a finding of "aggravated circumstances" does not require DHS to prove that meaningful services toward reunification were provided.[19]
Looking specifically to the termination hearing, this court notes the following testimony. Appellant testified that immediately preceding the hearing, she had *517 been employed for two weeks; had a new phone for two months; and had been living at the Salvation Army shelter for two days, following two weeks at a women's shelter. She denied receiving any help and asserted that she had never seen Fox, the IFS provider. Specifically, when asked "[i]f I understand your testimony correctly no one has offered you any assistance or followed through with any assistance and the first witness [Fox] was lying," she responded that she "[thought] so because [she had not] gotten any help till [sic] today." She testified that she tried not to call the juveniles too often "because it's really hard on [her]" and she "know[s] where they are[.]"
Contrary to appellant's assertions, Jana Petty, foster mom to the children, testified that she had tried to help appellant get an apartment. More specifically, Petty testified:
I had located an apartment for her, all she had to do was pay the first month's rent. The apartment manager was also a former foster child and he understood how hard it was for parents to get back on their feet. He offered to forego the cleaning deposit. That was at the Denver Street Apartments in Greenwood. There were two bedrooms and one bath. I had, uh -- I'm on some of the committees for the Head Start Program in Greenwood and one of them is the Social Services and we had contact with a lady that had put me in contact with the Adult Education Center. They offered to bring in an attorney to help with filling out paperwork to get citizenship. I contacted the Crawford/Sebastian Community Development and when Patricia got a job they would help her get her lights on, her utilities on. Oh, I also contacted HUD regarding assistance with rent and they said that they would help her because she fell under the abused women's laws; that all she had to do was come in and fill out the paper and tell them, you know, this is -- that she was in the shelter and they would help her get a place for her kids. Patricia had contacted me and said that they would not help her at the HUD office and so I had written all this information down and who I talked to, put it in a spiral notebook, gave it to her, because she had phone numbers, contact names; all she had to do was just call these people, get in touch with them and they were ready to help her. And when we had our Staffing she said she had thrown it away because it was no help to her.
Fox testified regarding attempts to get counseling set up for K.R. in her school that "[e]verything was in place; we just needed [appellant] to attend the initial intake there at the school. That did not occur while [Fox] had the case for IFS." Fox listed the following services attempted or completed for appellant: school-based counseling for the juveniles, getting HUD housing, reestablishing SNAP benefits, applying for TANNIF, setting up a P.O. Box as a "stable mail spot[,]" working with the Mexican Consulate and an immigration attorney to get appellant an ID and information to the HUD housing board.[20]
Harp testified that during her assignment to the case from October 6, 2016, to December 13, 2016, she "did referrals for her for IFS, for a Psyche Eval [sic], [she] transported the kids to school on occasion and [she] worked with the school to come up with a transport plan to get the kids to *518 school." When she was able to arrange transportation from the Rescue Mission for the children, "[she] provided detailed instructions on how to get everywhere [the children] needed to be for that. [She] wrote down the time to get them out of bed, the time that it would take to walk down there, what time [appellant] needed to leave the Mission to get there on time." She also had involvement with the Mexican Consulate and was part of the staffing in which appellant was advised "where the Consulate was going to be, when he or she was going to be there and what time [appellant] need to be there for it"; appellant did not indicate a need for assistance. She also testified to discussing the case plan and services during staffings, during which appellant communicated in English and never indicated that she did not understand any of the services or requests.
Angela Solylo, the family services worker who received the case on December 27, 2016, testified to DHS's "big concern" that G.L. wore pull-ups to school and had "very delayed" verbal skills. Appellant did not make contact with Solylo until February 2017, indicating that she was living with a friend-whom she would not identify-in an apartment-the address to which she would not give Solylo. The friend was later identified as Kohlhaas. She had assisted with trying to get appellant housing and had advised her at a staffing three weeks prior about a transitional-housing program she could get appellant into, as she was living in a shelter at the Salvation Army. Appellant "did not take [Solylo] up on the offer." Solylo was the FSW who saw appellant hand-in-hand with Kohlhaas in November 2016, after the entry of the circuit court's October 2016 restraining order. She could not verify appellant's income and stated that appellant told her "she [was] using somebody else's social security number and name[.]" Appellant declined a psychological evaluation and never completed a hair-follicle test.
It is clear to this court that the circuit court did not find appellant's assertions of lack of assistance to be credible. On the evidence before it-showing that DHS first sought protections in the home and sought emergency custody and, ultimately, termination of appellant's parental rights only after it was clear that services provided were not helping appellant-this court cannot hold that the circuit court erred. We hold that the circuit court's aggravated-circumstances finding was not clearly erroneous.
Affirmed.
Abramson and Harrison, JJ., agree.

The circuit court also terminated the parental rights of putative fathers Rene Ramirez and Ronny Hill in the same order; neither Ramirez nor Hill is a party to this appeal.

Having reached the age of majority at the time of the petition, though listed in the caption of the petition, appellant's eldest child is not a party to this matter and was not listed as a party to the matter beginning with the circuit court's ex parte emergency less-than-custody order.

Appellant filed a petition for contempt on February 28, 2017, asserting that she'd had only one visit with the juveniles since they had come into care and requested that she be awarded visitation with the juveniles. DHS responded to appellant's contempt motion on March 14, 2017, denying that appellant had only seen the juveniles once. It averred that it did not have contact with the mother until February 6, 2017, and she did not have a working phone.

Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)(a) (Supp. 2017). The petition stated, among other things, that appellant had "not been able to maintain stable employment that [DHS was] able to verify."

Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) . The petition stated that it had been made aware of domestic violence between appellant and Kohlhaas since the case opened, that the circuit court had entered a restraining order between the two after hearing testimony regarding the domestic violence on October 5, 2017; that appellant was observed "hand-in-hand" with Kohlhaas on November 4, 2017, and admitted violating the circuit court's restraining order "on at least two occasions" when confronted; and that it would be a risk to the juveniles if appellant "continue[d] a relationship with the violent man she described" at the hearing.

Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a) . The petition stated that appellant "is in no better position today as she was when this case first opened" nearly two years prior, having "continued to change employment and residences throughout the case"; "not completed any other services offered to her and [having] been rather uncooperative during the pendency of the case"; and "[having] chosen to remain tied to Mr. Kohlhaas" and "not taken advantage of the services provided in order to reunify her with her children."

Beck v. Ark. Dep't of Human Servs. , 2017 Ark. App. 467, at 4, 528 S.W.3d 869, 872.

Id. (citing Fox v. Ark. Dep't of Human Servs. , 2014 Ark. App. 666, 448 S.W.3d 735 ).

Id.

Id. (citing Smithee v. Ark. Dep't of Human Servs. , 2015 Ark. App. 506, 471 S.W.3d 227 ).

Caruthers v. Ark. Dep't of Human Servs. , 2017 Ark. App. 230, at 3, 519 S.W.3d 350, 352 (citing Lively v. Ark. Dep't of Human Servs. , 2015 Ark. App. 131, at 4-5, 456 S.W.3d 383, 386 ).

Id.

Oliver v. Ark. Dep't of Human Servs. , 2017 Ark. App. 565, at 3-4, 531 S.W.3d 447, 450 (citing Anderson v. Douglas , 310 Ark. 633, 839 S.W.2d 196 (1992) ).

Caruthers, supra.

Id.

Id.

Bynum v. Ark. Dep't of Human Servs. , 2017 Ark. App. 471, at 11, 528 S.W.3d 859, 867 (citing Reid v. Ark. Dep't of Human Servs. , 2011 Ark. 187, 380 S.W.3d 918 ).

Ark. Dep't of Human Servs. v. State , 2017 Ark. App. 55, at 10-11, 512 S.W.3d 655, 661-62 (citing Hollimon v. Hollimon , 2016 Ark. App. 583, 2016 WL 6994813 ; Cotten v. Fooks , 346 Ark. 130, 55 S.W.3d 290 (2001) ("[A]s a general rule, appellate courts of Arkansas will not review issues that are moot. To do so would be to render advisory opinions, which the court will not do. Arkansas appellate courts have generally held that a case becomes moot when any judgment rendered would have no practical legal effect upon a then existing legal controversy.") ) (internal citation omitted).

Kohlman v. Ark. Dep't of Human Servs. , 2018 Ark. App. 164, at 9, 544 S.W.3d 595, 600-01 (citing Ford v. Ark. Dep't of Human Servs. , 2017 Ark. App. 211, 2017 WL 1277398 ; Draper v. Ark. Dep't of Human Servs. , 2012 Ark. App. 112, 389 S.W.3d 58 ); see Bonner v. Ark. Dep't of Human Servs. , 2018 Ark. App. 142, at 10, 544 S.W.3d 90, 95 (" 'Aggravated circumstances,' on the other hand, does not require proof that DHS provided meaningful or appropriate reunification services[.]").

The HUD housing application had been completed and appellant's status "had been accepted" and "approved for expedited HUD housing" as of November 16, 2016. The SNAP application was completed and approved. The TANNIF application was completed and denied. She never obtained the ID which was "needed to set up just about anything[.]"